UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JUDITH LOURENE SILVERS,

      Plaintiff,

  v.

CCPOA BENEFIT TRUST HEALTH AND WELFARE PLAN,

      Defendant.
_____/

NO. CIV. 09-097 FCD/JFM

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on the parties' cross-motions for summary judgment, pursuant to Federal Rule of Civil Procedure 52, arising out of defendant CCPOA Benefit Trust Health and Welfare Plan's ("defendant" or "the Plan") denial of plaintiff Judith Lourene Silvers' ("plaintiff" or "Mrs. Silvers") claim for accidental death benefits.[1]

/////

---

[1] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

1

For the reasons set forth below, the court finds that the proper standard of review is de novo, and thereunder, the court finds that plaintiff has not met her burden in showing that her husband's death "resulted from" the hip injury he suffered ten months prior to his death. As such, the court DENIES plaintiff's motion for summary judgment and GRANTS defendant's motion.

## BACKGROUND

Plaintiff's husband, Hal Silvers ("Mr. Silvers"), deceased, was insured under a group accidental death and dismemberment policy ("the policy") through his union, the California Correctional Peace Officers Association ("CCPOA"). Hartford Life and Accident Insurance Company ("Hartford") issued and administered the policy, which covers retired members of the CCPOA. (Ex. A to First Am. Compl. ("Hartford Certificate of Insurance"), filed Feb. 21, 2008.) Mr. Silvers designated his wife, Judith Lourene Silvers, as his beneficiary. (Id.)

The policy states in pertinent part: "If a Covered Person's injury results in any of the following losses within 365 days after the date of the accident, we will pay the sum shown opposite the loss. . . . For Loss of: Life . . . The Principal Sum." (Ex. A to Decl. of Richard Davis ("Administrative Record"), filed Sept. 15, 2008, at H057.) "Injury" is defined in the policy as:

> bodily injury resulting directly and independently of all other causes from accident which occurs while [the covered person] is covered under this policy. Loss resulting from:
>
> a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or
>
> b) medical or surgical treatment of a sickness or

disease; is not considered as resulting from injury. (Hartford Certificate of Insurance; Administrative Record at H052.)

On May 7, 2003, Mr. Silvers fell at home while undressing to go to bed. (Administrative Record, at H070.) Mr. Silvers, age sixty-five, went to the Redding Medical Center Emergency Department ("the hospital") complaining of left hip and lower back pain. (Id.) Dr. Andrew Knapp examined Mr. Silvers, noting that Mr. Silvers "smokes a pack of cigarettes per day" and "drinks alcohol daily." (Id.) Dr. Knapp further noted that Mr. Silvers had a history of hypertension, osteoporosis, and arthritis and that he was on numerous medications, including "Xanax, Altrace, hydrochlorothiazide, prednisone, and codeine." (Id.) Dr. Knapp's physical examination revealed that the patient's "[l]ungs were clear of auscultation" and that he had a regular heart rate and rhythm. (Id.) Mr. Silvers was diagnosed with a hip fracture and admitted to the hospital under the care of Dr. Dale Adishian in orthopedics. (Id. at H071-72.)

Dr. Adishian examined Mr. Silvers later that same day. (Id. at H081-83.) Dr. Adishian reported that Mr. Silvers had been drinking prior to his fall and that Mr. Silvers had chronic obstructive pulmonary disease ("COPD") and hypertension. (Id. at H081.) According to the report, Mr. Silvers denied "any difficulty with ambulation" other than becoming short of breath. (Id.) Dr. Adishian recommended surgery to stabilize Mr. Silvers' left hip. (Id.)

Prior to the surgery, Dr. Adishian referred Mr. Silvers to Dr. Than Aung for review of Mr. Silvers' electrolyte imbalance.

(Id. at 134.) Dr. Aung noted that Mr. Silvers was an "alcohol drinker" (daily) and an "active smoker" (one to two packs a day). (Id.) He also reported that at the time of the physical examination, Mr. Silvers had no other illnesses and that "[r]espiratory wise and cardiac wise he seem[ed] to be stable." (Id. at H135.)

Mr. Silvers underwent hip surgery on May 8, 2003. (Id. at H186.) Orthopedic surgeon Dr. Adishian inserted an "intramedullary hip screw" in Mr. Silvers' left hip and femur. (Id.)

Post-operation, the following day, Mr. Silvers experienced "[w]orsening shortness of breath" and was transferred to the intensive care unit ("ICU"). (Id. at H138.) Dr. Aung referred Mr. Silvers to Dr. Amjad Musthafa. (Id.) Dr. Musthafa's impressions included, among other things: (1) "[a]cute postoperative respiratory insufficiency" and "early right upper lower pneumonia" (which had "arisen within 48 hours of admission"); (2) "[a]cute exacerbation of chronic obstructive pulmonary disease"; and (3) "[c]hronic alcohol abuse with significant risk of alcohol withdrawal/delirium tremens." (Id. at H140.)

A chest x-ray taken on May 10, 2003 revealed right upper lobe pneumonia. (Id. at H161.) Another x-ray, taken the following day, revealed a "clearing of the right upper lobe infiltrate" and was "[n]egative for pneumonia." (Id. at H159.) According to the hospital discharge summary, Mr. Silvers experienced the following complications: (1) "increased hypertension," (2) "shortness of breath and confusion associated

4

with chronic obstructive pulmonary disease," and (3) "[a]lcohol withdrawal requiring an ICU stay." (Id. at H067.) Mr. Silvers' condition continued to improve and, four days after the surgery, he was transferred out of the ICU and back to Orthopedics. (Id. at H068.) Mr. Silvers was discharged in stable condition on May 14, 2003. (Id. at H067-68.) According to the Discharge Planning Report, the hospital discharged Mr. Silvers to Canyonwood Skilled Nursing Facility for short term placement for physical therapy. (Id. at H129.)

During the period between the hip fracture and his death ten months later, Mr. Silvers visited the Palo Cedro Medical Clinic and was seen by Dr. Charles Honnold. (Id. at H018, H291-93.) Mr. Silvers visited Dr. Honnold on several occasions between July 2003 and March 2004. (Id. at H291-93 (noting visits in July 2003, August 2003, September 2003, November 2003, and March 2004).) Mr. Silvers' chief complaint during this time appeared to be pain in his back and hip, for which Dr. Honnold prescribed medication. (Id.) Dr. Honnold's notes state the following: "sodium penathal, heart, breathing problems." (Id.)

Dr. Honnold also noted the following during Mr. Silvers' visits to the Palo Cedro Medical Center in the months preceding Mr. Silvers' death:

- July 2003 visit: Mr. Silvers' lungs "clear."

- August 5, 2003 visit: Mr. Silvers "ambulating with a cane" but "not tolerating walking well."

- September 3, 2003 visit: Mr. Silvers taking flu medication and his ambulation "slowly improving."

- November 17, 2003 visit: Mr. Silvers had "[g]ood days and (mostly) bad days" and "wanted to stop smoking."

- March 11, 2004 visit: Mr. Silvers suffered a "mini-stroke" one and a half months ago and was suffering from "cognitive disorder."

(Id. at H291-93.)

Mrs. Silvers described Mr. Silvers' condition in the months following the accident on Hartford's Proof of Loss form. (Id. at H290.) According to Mrs. Silvers, her husband "was on oxygen since" his hip surgery and "was never able to walk again or breath without oxygen." (Id.) Mrs. Silvers further stated that she believed her husband "had a low grade temperature since" the surgery and that "[i]t was a downward spiral to his death on 3-21-04." (Id.)

Ten months after the surgery, on March 19, 2004, Mr. Silvers was admitted to Mercy Medical Center in Redding, California with worsening back pain "to the point where he was unable to ambulate and unable to be cared for at home." (Id. at H318-19.) Dr. David Short evaluated Mr. Silvers, indicating that he had not seen Mr. Silvers for approximately one year. (Id. at 319.) Dr. Short described Mr. Silvers as a "66-year-old male who has a history of chronic alcohol abuse, COPD, and chronic back pain and arthritis." (Id.) Dr. Short's assessment included: (1) "[i]ntractable low back pain," (2) "[e]levated WBC of uncertain significance," (3) "[c]hronic alcohol abuse," and (4) "COPD." (Id. at H320-21.)

While hospitalized, Mr. Silvers was attended by Dr. William Harden. (Id. at H331.) On March 21, 2004, Dr. Harden reported that Mr. Silvers had a urinary tract infection and possible urosepsis. (Id. at H323.) Mr. Silvers passed away later that day. (Id. at H331.) Dr. Harden's summary report stated: "This

66 year old gentleman, alcoholic with a long history of frailty and progressive weakness was admitted 3/19/04 for back pain, decreased level of consciousness, and possible pneumonitis." (Id.) Mercy Medical Center noted that Mr. Silver's principal diagnosis was "urinary tract infection," with secondary diagnoses as: "Chronic airway obstruction," "unspecified alcohol dependence," "abdominal aneurysm without rupture," "essential hypertension, unspecified benign or malignant," and "tobacco use disorder." (Id. at H329.)

Dr. Short completed Mr. Silvers' death certificate on March 23, 2004. (Id. at 370-71.) The death certificate lists the immediate cause of death as "pneumonia," with a time interval between onset and death of one week. (Id. at H371.) The death certificate further lists COPD as the underlying cause of death, with a time interval between onset and death of ten years. (Id.)

Subsequently, on April 21, 2004, Dr. Short reported on Hartford's Cause of Death form that the leading cause of death was pneumonia "due to" COPD and "debility from hip fracture."[2] (Id. at H017, H019.)

**STANDARD**

Before reaching the merits of the parties' motions, the court must determine the appropriate standard of review to apply to Hartford's denial of benefits determination.

---

[2] The parties have not indicated, nor can the court determine from the record, who gave this Hartford form to Dr. Short, for what purpose it was given to him, why it was signed almost one month after the death certificate, and why this is the first mention that the pneumonia was "due to," in part, debility from hip fracture.

7

The policy at issue here is a group accidental death and dismemberment policy governed by ERISA. In <u>Firestone Tire 7 Rubber Co. v. Bruch</u>, the United States Supreme Court held that a challenge to the denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). Where a plan document gives an administrator such discretionary authority, a court must apply the "abuse of discretion" or "arbitrary and capricious" standard of review to the administrator's decision to deny benefits. <u>Id.</u> at 111; <u>see also</u> <u>Abatie v. Alta Health & Life Insur. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006).

In this case, however, the parties agree that no such discretionary provision exists in the policy and thus the *de novo* standard of review applies. (Pl.'s Mot. for Summ. J. ("Pl.'s MSJ"), filed Sept. 15, 2008, at 6; Def.'s Mot. for Summ. J. ("Def.'s MSJ"), filed Sept. 15, 2008, at 9.) Under *de novo* review, the court determines whether the plaintiff is entitled to benefits under the terms of the plan without deference to either party's interpretation. <u>Firestone Tire & Rubber Co.</u>, 489 US at 112; <u>see also</u> <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006) ("If de novo review applies, no further preliminary analytical steps are required. The court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits . . . ."). Pursuant to Federal Rules of Civil Procedure, Rule 52(a), the court conducts what is essentially a bench trial on the administrative record. <u>Kearney</u>

8

v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999).

Under a *de novo* standard of review, the plaintiff has the burden of proving his or her eligibility for benefits under the terms of the plan by a preponderance of the evidence.[3] Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan . . . ."); see also Jordan v. Northrop Grumman Corp. Welfare Ben. Plan, 63 F. Supp. 2d 1145, 1155 (C.D. Cal. 1999) ("[T]he burden in making [an ERISA] claim is on Plaintiff . . . ."); see also Wies v. Accidental Death & Dismemberment Benefit Plan of Kaiser Found. Health Plan Inc., 442 F. Supp. 2d 850, 855-56 (N.D. Cal. 2006) (applying the preponderance of the evidence standard to determine whether the accident was the proximate cause of the plaintiff's loss). The defendant has the burden of proving "the applicability of any plan coverage exclusion [it] seek[s] to invoke." Sabatino, 286 F. Supp. 2d at 1232.

## ANALYSIS

Applying the *de novo* standard of review to the facts of this case, the court must first determine whether plaintiff has met her burden in proving that her husband's death is covered by the terms of the policy.

---

[3] Pursuant to the Ninth Circuit jury instructions, "When a party has the burden of proof on any claim . . . by a preponderance of the evidence, it means [that the factfinder] must be persuaded by the evidence that the claim . . . is more probably true than not true." 9th Cir. Jury Instr. § 1.3. This decision should be based "on all of the evidence, regardless of which party presented it." Id.

The policy at issue here is an "Accidental Death and Dismemberment Policy," which pays the principal sum of $100,000.00 when a covered "injury" results in the loss of life of the insured person within 365 days after the date of the accident. (Administrative Record, at H057.) The "injury" must result "directly and independently of all other causes" from an "accident" that occurs while the insured person is covered under the policy. (Id. at H052.) The policy covers "loss" resulting from said injury, including the loss of life. (Id. at H057.) However, loss resulting from "sickness or disease . . . . is not considered resulting from injury." (Id. at H052.)

Defendant contends that under the terms of the policy, the "loss" suffered by the insured person must result directly and independently from the injury. (Def.'s MSJ, at 1 ("The policy provided benefits only for loss 'resulting directly and independently of all other causes from accident.'" (emphasis deleted)).) In other words, defendant contends that plaintiff must prove that Mr. Silvers' hip fracture directly and independently caused Mr. Silvers' death ten months later. However, defendant misreads the policy. The court must "'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a [person] of average intelligence and experience.'" McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1134 (9th Cir. 1996) (quoting Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir. 1990)). Here, the policy clearly states: "If a Covered Person's injury results in any of the following losses within 365 days after the date of the accident, [Hartford] will pay the sum shown opposite the loss."

10

(Administrative Record, at H057) (emphasis added). The policy goes on to state that for the *loss of life*, the beneficiary receives the "principal sum" of $100,000.00. (Id.) Thus, according to the plain language of the policy, death is a "loss" *resulting from* an injury, not the injury itself. The policy goes on to define "injury" as "bodily injury resulting directly and independently of all other causes from accident which occurs while [the insured] is covered under [the] policy." (Id. at H052) (emphasis added). Thus, the "directly and independently" language connects the *injury* to the *accident*, not the *loss* to the *injury*. Compare McClure, 84 F.3d at 1135 (analyzing an ERISA policy that "insures against *loss* 'resulting directly and independently of all other causes from bodily injuries caused by accident.'" (emphasis added)).

Given this reading of the policy, for plaintiff to prove her eligibility for benefits, she must show: (1) that Mr. Silvers' injury (i.e., the hip fracture) was "directly and independently caused" by the accident (i.e., the fall) and (2) that the loss (i.e., the death) resulted from the injury within 365 days of the injury.

The parties do not dispute that Mr. Silvers fell while getting undressed on the night of May 7, 2003 (Administrative Record, at H070), and that this fall constitutes an "accident" within the terms of the policy. Nor do the parties dispute that Mr. Silvers' "injury" (i.e., his fractured hip) "result[ed] directly and independently of all other causes" from the fall. The issue here is whether plaintiff has met her burden in establishing that the loss (i.e., Mr. Silvers' death) *resulted*

11

*from* the injury.[4]

Defendant cites <u>McClure</u> to support its contention that plaintiff does not qualify for benefits under the policy. (Def.'s MSJ, at 10-12.) The accidental disability policy at issue in <u>McClure</u> insured against *loss* "resulting directly and independently from the accident." 84 F.3d at 1135. The court sought to interpret the language "directly and independently" and to determine whether the plaintiff's preexisting back condition precluded recovery. <u>Id.</u> at 1134-35. However, as discussed above, the "directly and independently" language in Hartford's policy at issue here refers to the relation of the "injury" to the "accident" (which neither party disputes), not the relation of the "loss" to the injury. Thus, the test used by the court in <u>McClure</u> is inapplicable here. Rather, in this case, the court must simply determine whether Mr. Silvers' death "resulted from" the fractured hip.

The court interprets "resulted from" to require that the accident set in motion a chain of events leading directly to the loss at issue (i.e., death). <u>See</u> <u>Henry v. The Home Ins. Co.</u>, 907 F. Supp. 1392, 1398 (C.D. Cal. 1995) (interpreting "proximate cause"); <u>McClure</u>, 84 F.3d 1129 at 1133. In other words, to meet her burden in showing that Mr. Silvers' death "resulted from" the hip fracture, plaintiff must point to specific evidence in the administrative record demonstrating that Mr. Silvers was in state of deterioration from his fall until his death. Plaintiff fails

---

[4] Neither party disputes that the death occurred within 365 days of the accident. The accident took place on May 7, 2003, and Mr. Silvers died a little over ten months later on March 21, 2004. (Administrative Record, at H070 H331.)

12

to meet this burden.

Although Mr. Silvers' lungs were "clear of ausculation" when he was admitted for surgery, various doctors' reports noted Mr. Silvers' preexisting medical problems. Specifically, these doctors noted that Mr. Silvers suffered from hypertension, osteoporosis, arthritis, and COPD at the time of the accident. (Administrative record, at H070, H081.) Several doctors also reported that Mr. Silvers had a history of "active" drinking and smoking. (Id. at H070, H081, H134.)

After the surgery, Mr. Silvers experienced "acute postoperative respiratory insufficiency," "early right upper lobe pneumonia," "[a]cute exacerbation" of COPD, and "alcohol withdrawal/delirium tremens." (Id. at H140.) He was immediately transferred to the ICU upon experiencing "worsening shortness of breath." (Id. at H138.) Rather than continue on a "downward spiral toward death," Mr. Silvers' condition improved. An x-ray taken on May 11, 2003 revealed a clearing of the lungs and was negative for pneumonia. (Id. at H159.) Mr. Silvers was discharged in stable condition on May 14, 2003. (Id. at H067-68.)

Moreover, and most problematic for plaintiff, Mr. Silvers died over ten months after the surgery. (Id. at H186; 331.) Significantly, in neither moving for summary judgment nor opposing defendant's motion, did plaintiff cite any evidence in the record describing Mr. Silvers' medical condition during this ten month period. Upon its independent review of the entire administrative record, the court discovered Dr. Honnold's notes, presumably taken during medical visits with Mr. Silvers between

13

July 2003 and March 2004. (Id. at H291-93.)  However, there is no declaration or affidavit deciphering or explaining the significance of these notes; the court cannot, on its own, draw medical inferences.  From what the court can properly discern, Mr. Silvers was seen, during this time, primarily for hip and back pain.  (Id.)  Dr. Honnold also describes that Mr. Silvers suffered a stroke some time around the end of January/beginning of February 2004.  (Id. at H291.)  However, plaintiff does not attempt to explain the circumstances surrounding the stroke or otherwise connect it to the hip fracture in any way, and the administrative record itself does not reveal these answers.

The only evidence relating to this ten-month period upon which plaintiff specifically relies is (1) the written statement by Mrs. Silvers on Hartford's Proof of Loss form (id. at H290 (stating that Mr. Silvers' "was on oxygen since" his surgery, "was never able to walk again or breath without oxygen," "had a low grade temperature since the surgery," and was on a "downward spiral to his death")), and (2) Dr. Short's April 24, 2004 statement, that the leading cause of Mr. Silvers' death was pneumonia "due to" COPD and "debility from hip fracture."  (Id. at H019.)  However, these statements do not adequately bridge the ten-month gap between Mr. Silvers' hip fracture and death. Neither Dr. Short's nor Mrs. Silvers' statements are adequately corroborated by the administrative record.  Indeed, nothing in the contemporaneous notes from Mr. Silvers' second hospital stay mention debility or immobility from hip fracture, so as to support Dr. Short's subsequent statement on April 24, 2004. Moreover, the April 24 statement is inconsistent with Dr. Short's

14

previous findings on March 23, 2004, indicating on Mr. Silvers' death certificate that the cause of death was pneumonia, with COPD as the underlying cause of death.

Ultimately, Mr. Silvers' initial post-operative bout with pneumonia cleared up within a couple days. (Id. at H161, H159.) His death certificate indicated that the pneumonia that caused his death began only a week prior to his death (id. at H371); there is no indication that Mr. Silvers suffered from pneumonia or any surgery-related complication in the ten months between the surgery and just prior to his death. In fact, the death could have resulted from any number of intervening events, including the unexplained stroke, or Mr. Silvers' documented struggles with COPD, alcoholism, and smoking. Given Mr. Silvers' preexisting medical conditions, the fact that his condition significantly improved after the surgery, and the ten-month gap in the record explaining Mr. Silvers' interim medical condition, plaintiff has not met her burden in proving by a preponderance of the evidence that Mr. Silvers' death resulted from the hip injury.

**CONCLUSION**

For the foregoing reasons, the court GRANTS defendant's motion for summary judgment and DENIES plaintiff's motion for summary judgment. The Clerk of the Court is directed to close this file.

IT IS SO ORDERED
DATED: April 14, 2009.

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE